JOHN A. HORBACH, APPELLANT, V. WILLIAM W. MARSH ET AL., APPELLEES.

FILED MAY 9, 1893. No. 4843.

1. Corporations: PURCHASE OF CORPORATE PROPERTY BY OF-
    FICER AT JUDICIAL SALE. An officer of a corporation for pe-
    cuniary profit, who in good faith purchases at judicial sale the
    property of the corporation, will be protected in such purchase,
    provided he shows affirmatively that he has, as indicated, paid the
    full value of the property of which he so became the purchaser.

2. ———: ———: FRAUD: ACTION BY STOCKHOLDERS: LIMITA-
    TION OF ACTIONS. A stockholder of a corporation who seeks
    as such to impress with an express trust the property of such
    corporation regularly sold at judicial sale to an officer of such
    corporation should commence proceedings within a reasonable
    time after such sale, and must, when such proceedings are un-
    reasonably delayed, establish by a preponderance of the evi-
    dence the facts upon which such trust is based.

3. ———: ———: ———: ———: ———. The lapse of four years
    after the discovery of the alleged frauds, or of such facts as were
    sufficient to demand such investigation by plaintiff as would
    have disclosed the alleged frauds, bars an action brought for re-
    lief upon the ground of such fraud.

4. Amendment After Trial: HARMLESS ERROR. After the
    submission of an equitable action for final determination, there
    was no prejudicial error in refusing an amendment of plaintiff's
    petition proposed to meet the alleged proofs, where, upon a full
    consideration of all the evidence upon appeal in this court, it is
    found that the relief prayed must in any event be denied.

APPEAL from the district court of Douglas county. Heard below before WAKELEY, J.

*Joseph H. Blair,* for appellant.

*George E. Pritchett, contra.*

RYAN, C.

The petition in this case was filed in the district court of Douglas county on the 16th day of November, 1889, by the plaintiff therein, on behalf of himself and all other stockholders of the Omaha Horse Railway Company of like interest with plaintiff.    He alleged that the Omaha Horse Railway Company was created a corporation by an act of the territorial legislature of the then territory of Nebraska, approved February 18, 1867, and that as such corporation it ever since and still exists; that plaintiff is the owner of twenty shares of the first issue of ten thousand shares of the fully paid up stock of said company, and became such owner on January 1, 1879; that on May 19, 1877, the Omaha Horse Railway Company was indebted to Peter E. and Joseph D. Iler in the sum of $700, which was part of the indebtedness of $20,000 of said company, secured by a mortgage and trust deed to Joseph H. Millard, as trustee, upon all the property of the company, of the value of upwards of $100,000; that though the sum so secured was due, yet the said Joseph H. Millard, trustee, although requested, refused to bring suit for the foreclosure of said mortgage, because the property was more than ample security for the debt, and the company could have easily raised the money and paid said debt, and it was its duty so to do; that on May 19, 1877, the defendant Marsh was one of the directors and the president of said Omaha Horse Railway Company, and owned a large number of its shares of stock and had the management of said company, and that it was in his power, as such officer, to raise the money to pay the debts of said company, which he failed to do, and permitted the said Ilers to bring said foreclosure suit, and thereafter procured himself to be made

a party defendant in said action; that a decree of foreclosure was rendered in said suit on January 6, 1879, and that pending said suit said Marsh bought up other shares of the stock of said company, so that when decree was rendered Marsh was owner of a majority of the stock of said company, and assigned to Frank Murphy and W. A. Smith, respectively, five shares of said stock, without consideration; that while said suit was pending an accounting was had, and it was found that the total indebtedness of the company secured by said mortgage was $29,413.01, and that under a second mortgage there was due the further sum of $3,-743.59, making the total indebtedness $33,156.60, and in said foreclosure proceedings the decree was that unless the said sum found due was paid within ten days from its rendition the mortgaged property should be sold to pay the debt; that on March 8, 1879, there was a sale, under said decree, of the property of said Omaha Horse Railway Company, at which defendant Marsh, then being a director as well as president and superintendent of said company, bid off said property for $24,500 and took to himself a sheriff's deed therefor.

The petition stated in detail that by resolution the place of meeting of the stockholders of said Omaha Horse Railway Company was fixed at an obscure place; said resolution having been adopted at a meeting of the stockholders of said company, at which only W. W. Marsh, Frank Murphy, and W. A. Smith were present; that meetings were held at such obscure place and without due notice to the stockholders of said company; that a deed to them of three-fifths of the property of the Omaha Horse Railway Company was made by Marsh, Guy C. Barton, Frank Murphy, and S. H. H. Clark; that to wrong, cheat, and defraud said company and its *bona fide* stockholders out of its and their property the said Marsh, Barton, Murphy, and Clark made to the Omaha Horse Railway Company the following proposition:

"*To the Omaha Horse Railway Company:* The undersigned hereby offer and propose to sell and convey to you the franchise of said company and all the lines of street railway now operated by us in the city of Omaha, Nebraska, together with all the horses, harness, street cars, barns, and other property connected therewith and owned and used by us in the operation of said street railway, and also to pay or procure the discharge of all the indebtedness now in judgment against you for and in consideration of the issue to us of the full paid stock of said company of the probable value of $300,600 and the bonds of said company in the sum of $233,000, payable in twenty years, with interest at the rate of six per cent per annum, payable semi-annually, secured by a first mortgage on said property and all property of every kind which may be hereafter acquired by said company.

" Dated at Omaha, February 12, 1884.

" W. W. MARSH.
"GUY C. BARTON.
" FRANK MURPHY.
"S. H. H. CLARK."

That at a meeting of the stockholders of said company a resolution was adopted accepting the above proposition; that at said meeting Clark, Murphy, Barton, Marsh, and W. A. Smith were elected directors of said company; that at said time the said company was not indebted in any sum whatever, its earnings being sufficient to pay all indebtedness, which was correctly stated in the aforesaid decree of date January 6, 1879, and its expenses; that its earnings were largely in excess of what was necessary to pay both its indebtedness and running expenses; that said property when said proposition was made and accepted, was of the value of over $200,000 above all debts, and was free of all judgments and incumbrances, and that there was then a balance in the hands of Marsh and Murphy, as would appear upon an accounting duly had; that pursuant

to said accepted offer Marsh, Clark, Barton, and Murphy by a deed dated May 13, 1884, pretended to convey to said Omaha Horse Railway Company all its own property, the consideration named in said deed being $593,000, or $93,000 more than twice what it was rated at when Marsh deeded three-fifths of it three months before to Murphy, Clark, and Barton. The petition further alleged that on July 11, 1884, the said Clark, Murphy, Barton, and Smith, who were then directors of said company chosen on February 20, 1884, unlawfully, wrongfully, and without any consideration moving therefor, issued and distributed among themselves $300,600 of stock, and $233,000 of the bonds of said company, secured by mortgage upon the property of the company made also by themselves May 30, 1884. What was done with the remaining $67,000 of said bonds the plaintiff alleged that he was unable to state, and demanded an accounting.

The petition further, in substance, stated that by a combination between the parties last named as directors the property of the Omaha Horse Railway Company was taken possession of, and a consolidation of said company, and a transfer of all its property, and a merger of its franchise with that of another company then in existence, was in contemplation, and if not prevented would be consummated; that the several transfers from the said Marsh to the other parties named as directors were simply a part of a scheme to defraud the other stockholders of the Omaha Horse Railway Company of their rights as such in said company. The manner in which this was attempted to be carried on is alleged at great length and considerable detail in the petition, but it would subserve no profitable use to set out these details more fully than has already been done.

The answer admitted the indebtedness to the Ilers, the foreclosure, and the purchase thereunder by Marsh of the property of the Omaha Horse Railway Company, but denied that there was in said purchase, or in any other

transaction, any intent to cheat or defraud any stockholder of said Omaha Horse Railway Company, and alleged that whatever was done was simply done by said Marsh in his own right and for the protection of his own interest. It alleged that at the time the action was brought to foreclose the mortgage executed to Millard, as trustee, the company was hopelessly insolvent; that the property of the company was not worth more than one-half of its indebtedness; that besides the mortgage indebtedness there was a large floating indebtedness, and, in effect, denied the material averments of the petition. The answer also alleged that on the 2d day of April, 1889, the Omaha Street Railway Company was formed by the consolidation of the Omaha Horse Railway Company and the Omaha Cable Tramway Company, and that ever since said 2d day of April, 1889, all the property, rights, and franchises of said two constituent companies have been owned and operated and in the possession of said Omaha Street Railway Company. The defendant also pleaded the statute of limitations in this connection.

Upon these pleadings, the testimony was taken, and in July, 1890, the case was taken under advisement by the court, though no final decision was made until February 11, 1891. In December, 1890, the plaintiff applied for leave to amend his petition so as to conform, as he alleged, to the proofs adduced on the trial. The purpose of this amendment was to allege that Marsh encouraged Ilers to bring the foreclosure suit, and after it was commenced, fraudulently contriving and intending to get control of the stock and property of said company, and to cheat plaintiff and others out of their stock, shares, and interest in said company, procured himself to be made a defendant as hereinbefore stated. It further alleged, in addition to the first averments of the original petition, that upon an accounting, and before the sale under the decree obtained by Ilers against the Omaha Horse Railway Company, it was found

that said company was also indebted under a judgment
known as the Doolittle judgment, in the sum of $5,008.28,
and under a judgment in favor of the State Bank in the
sum of $2,515 58, and that the total indebtedness of said
company secured as above stated, that is by first and second
mortgage hereinbefore referred to, and under said judg-
ments, all told, amounted to the sum of $40,680.46, and
that further than this said company was not indebted in any
sum whatever. It also more fully alleged the different
schemes set on foot by Marsh, in which he was alleged to
have been assisted by Murphy, Smith, and his associates
to involve in appearance the title to the paper derived from
Marsh by the Omaha Street Railway Company aforesaid,
though in fact the same was alleged to have been held by
Marsh and his associates for Marsh's sole benefit.

The petition further stated that the plaintiff Horbach, prior
to said sale upon foreclosure, and as the date named there-
for was drawing nigh, prepared himself with funds suffi-
cient to bid said property off for the sum of $40,000, and
intended to bid on the same on the sale to that amount;
that said Marsh was apprised of this fact, and came to
plaintiff and arranged with plaintiff not to bid at the sale,
and that the defendant Marsh then stated to plaintiff that
he, the said Marsh, desired and intended to bid the same
off at the coming sale in his own name for the benefit of
all the stockholders and all persons interested in the prop-
erty, and that if plaintiff would refrain from bidding, he,
the said Marsh, would bid the same off and hold the same
in his own name for the benefit of all the stockholders and
all parties interested therein. Plaintiff says that in con-
sideration of said promises, offer, and agreement, he prom-
ised and agreed not to bid on the same, and refrained from
bidding thereon at the sale, and permitted the said defend-
ant Marsh to bid said property off at said sale. The pro-
posed amendment to the petition was further to the effect
that but for the aforesaid promises, offer, and agreement of

the said Marsh, the plaintiff would have bid on said property to the amount of the then indebtedness, interest, and costs due thereon, but that he relied upon the promises and agreement of the said defendant Marsh that he would bid in said property in trust for all the stockholders, and hold the same in his own name until such time when the company could earn and pay off its indebtedness, and that relying on said promises and agreement the plaintiff refrained from bidding, and did not bid at said sale, and the said plaintiff said that the said promises, offer, and agreement of the said defendant, made as aforesaid to plaintiff, were designedly made to him with the intent to wrong, cheat, and defraud the plaintiff and the other stockholders out of their stock and out of their interest in and to said stock. The further proposed amendments were simply such as to charge that the promises of Marsh as to bidding in the property for the benefit of the stockholders of the Omaha Horse Railway Company, and his violation of said promises, were each solely for the purpose of cheating and defrauding the stockholders of the Omaha Horse Railway Company as to the property of said company, in respect of which each of said stockholders, as such, were interested.

The court refused to permit amendments to the petition as proposed. The prayer of the said proposed amendments, as well as in the original petition, was that the defendants should be required to show how much stock over and above the original one thousand shares had been issued by them; that they may be required to surrender the same for cancellation; that they be required to return to said company all sums of money they may have received, or that the company has paid out as dividends thereon; that in case they cannot or shall not surrender said stock, that they be required to pay to the company the face values thereof with all dividends the company has paid out thereon; and that said defendants be required to surrender up for cancellation all the bonds of said company issued by

them, and return to the company all sums of money at
any time paid out as interest on said bonds; that in case
they shall not surrender said bonds for cancellation that
they be required to pay said company the full face value
thereof, together with all interest the company has at any
time paid out thereon.   And the plaintiff further prayed
that a full accounting might be had of all receipts and ex-
penditures, debts and credits of said company from Janu-
ary 1, 1879, to the present time, and for the appointment
of a receiver to take charge of all the books of the com-
pany, and papers showing its business since January 1,
1879, and that said defendants be required to pay over,
under order of the court, whether for said stock or bonds,
or both, the balance of the earnings of the company over
and above expenditures, and for general equitable relief.

On the 11th day of February, 1891, a decree was en-
tered in this cause as follows: "This action having been
heretofore tried to the court, and the plaintiff having, be-
fore the conclusion of the trial, filed his motion for leave
to amend his petition to conform to the facts proved and
tendered in said proposed petition, and the court having
taken the case and said motion under advisement, and be-
ing now fully advised in the premises, it is now ordered
that said motion be and it hereby is overruled, to which
the plaintiff excepts, and thereupon the court finds, upon
the issues joined, for the defendants, to which the plaintiff
excepts.   It is therefore ordered and adjudged that this
action be dismissed for want of equity, and that the de-
fendants recover of the plaintiff their costs of this action
to be taxed."

Under the petition, as originally filed, the theory of the
plaintiff evidently was that by reason of the fiduciary re-
lations sustained by W. W. Marsh to the Omaha Horse
Railway Company, whatever purchase was made by him
would of necessity inure to the benefit of that company
and its stockholders.   There is no averment of any irregu-

larities or defects in the foreclosure proceedings at the suit of the Ilers against the Omaha Horse Railway Company, nor is there any allegations of any defect in the sheriff's sale or confirmation such as in any way to impair the title of Marsh under his sheriff's deed.

The question which is presented by these pleadings then is, whether or not Marsh, as director and president of the Omaha Horse Railway Company, would be held as trustee for the benefit of the stockholders of that company in any purchase which he made.   The amount of the decree under which the sale was made was, as alleged by the petition, something over $33,000.   The proposed amendment to the petition admits the existence of a judgment in favor of Doolittle, and one in favor of the State Bank, which swell the indebtedness of the Omaha Horse Railway Company at the time of the foreclosure to upwards of $40,000. The amount bid at the foreclosure sale by Marsh was $24,500.   No claim is made in the petition that he used funds other than his own in making this purchase, except inferentially it is asserted that the earnings were sufficient to pay the indebtedness of the company, and in a general way it is asserted that he had a balance in his hands over and above the indebtedness of the company; but of the fact that he advanced the $24,500 in payment of the bid made by him there can be no question upon the testimony. Under these circumstances the original theory of the plaintiff can only be made available upon the assumption that an officer of a corporation has no right whatever in his individual capacity to advance money for a corporation, or purchase its property at a judicial sale.

In the case of *Gorder v. Plattsmouth Canning Company,* 36 Neb., 548, a somewhat similar question was considered by this court.   In the opinion filed by POST, J., the following language occurs: "There is no doubt that the relation of directors of a corporation, of which they are officers, are of a fiduciary character, and their contracts and

dealings with respect to the corporate property will be care-
fully scrutinized by the court.    There are cases to be found
in which it is asserted that such contracts are absolutely
void and not enforcible either in courts of law or in equity,
but the decided weight of authority, as well as the most
satisfactory reasoning, sustains the view that they are void-
able only.   It is frequently stated in the reports and text-
books that contracts between corporations and their direct-
ors will be set aside by courts of equity at the election of
the stockholders, but such statements are not strictly accu-
rate.   Not every purchaser of corporate property by direct-
ors of a corporation will be adjudged void in an action by
the stockholders, even by courts of equity.   On the con-
trary, the relation of directors to the stockholders of a cor-
poration is not essentially different from that ordinarily
existing between trustee and *cestui que trust*.   Courts of
equity will set aside such contracts on the ground of fraud
and generally upon slight showing of fraud or bad faith
by the trustee, but where it is clear that the transaction is
in good faith and the *cestui que trust*, being under no dis-
ability, has received and retains the consideration paid for
the trust property by the trustee, it will be upheld when
assailed either in law or in equity."

 In the case at bar the money paid by Marsh was not
paid by him to his *cestui que trust* it is true, and yet it was
paid for the *cestui que trust* as completely as though directly
so to it or to the stockholders of the Omaha Horse Rail-
way Company.   By the most solemn method of proof it
had been ascertained that said company was indebted to an
amount of over $33,000, and its property was ordered sold
for the payment of that indebtedness.   The proofs show
that Marsh at the sale competed against all purchasers to
the extent of running the property from $16,000 up to
$24,500; he paid this amount upon his bid, and it was
applied to the extinguishment of the indebtedness of the
Omaha Horse Railway Company without any objection

and with the acquiescence of every stockholder of that company. Having in view simply his fiduciary relation, therefore, he is entitled to full protection in his purchase under the language of the case just quoted from, unless something more than a mere fiduciary relation is shown to affect his rights. The proposed amendment to the petition, however, was based upon the theory of an expressed rather than an implied trust, possibly in addition thereto. The averments made by way of amendments in the proposed amended petition were to the effect that previous to the sale under the Iler foreclosure plaintiff had a conversation with Marsh, in which he expressed the intention of bidding at the proposed foreclosure sale, and was assured by Marsh that he himself would bid in the property of the Omaha Horse Railway Company for the benefit of the stockholders of that company. The plaintiff, in his amendments to the petition, alleged that he relied upon these assurances, and that by reason of such reliance he was induced to and did refrain from bidding upon the property at said foreclosure sale; that Marsh was thereby enabled to purchase said property, and did so purchase the same in his own name though with plaintiff's expectation and understanding, superinduced by the assurances of Marsh to that effect, that the property would be held by Marsh for the benefit and protection of the stockholders generally. It was afterwards proposed by plaintiff, rather inconsistently with this theory, that he should purchase one-half of this same property of Marsh.

There is abundant testimony that the property at the time of the purchase at the foreclosure sale was of little value, and that the price paid by Marsh was reasonable. It is shown that subsequently, either owing to the growth of the city of Omaha or other circumstances, or perhaps all combined, the property rapidly appreciated in value and earning capacity. It was purchased by Marsh in 1879, and it is claimed by plaintiff was held by Marsh until it became much more valuable, when the trust under which

it was held by Marsh was repudiated, and the property treated as the property of Marsh and his associates alone, without reference to the rights of the stockholders. The preponderance of the evidence shows that Marsh bid in this property without any promise, agreement, or understanding such as would constitute him a trustee in respect thereof, for the benefit of the stockholders of said company; that he afterwards used, operated, and improved the same under great difficulties solely for his own profit and benefit; that the sheriff's deed which he received upon its purchase at the foreclosure sale to himself individually was immediately recorded; that the deed evidencing the conveyance of the three-fifths interest in said property to his co-defendants was also placed on record as soon as executed; that every act and use by him of the property was consistent with his individual ownership thereof; that immediately upon acquiring said property the accounts in relation to the receipts and expenditures of the Omaha Horse Railway Company were changed so as to indicate that there was no intention that they should be binding upon or for the benefit of the Omaha Horse Railway Company. It is true that in the litigation between the Omaha Horse Railway Company, plaintiff, against the Omaha Motor Railway Company and William M. Hewitt, defendants, statements were made under oath by Marsh which apparently should modify this general statement. In this evidence Mr. Marsh testified that he had been a stockholder in the Omaha Horse Railway Company for fifteen years previous to the 1st of July, 1888, and had held stock therein right straight along, and that he had held the property for two or three years as belonging to the Omaha Horse Railway Company, and that finally it was conveyed to the company.

Bearing in mind the apparent value attached to what was claimed by all the parties to this suit as to the exclusive franchise to operate a horse railway in the streets of Omaha under the act of the territorial legislature of Nebraska,

approved February, 18, 1867, it is not difficult to account
for the line of conduct pursued by Marsh and his testimony
in the case referred to.   This exclusive franchise was in
terms granted to the Omaha Horse Railway Company.
The purchase of the property by Marsh did not of course
vest him with that franchise.   To avail himself of the
benefits in that respect of the act referred to, Marsh reor-
ganized the Omaha Horse Railway Company, after which
he and his associates conveyed to said company the prop-
erty necessary for its operation, for which they received as
payment the stock and bonds of said company.   Evidently
this course was taken to control, on the one hand, the man-
agement of the property, and, on the other, to render avail-
able a special grant of franchises which were believed to
be exclusive in their nature.   Though the Omaha Horse
Railway Company was reorganized, there seems to have
been adopted no amendments in the way of a change in its
name or otherwise, and it is therefore not strange that in his
dealings with a rival company, calling in question the ex-
clusiveness of the franchises claimed, Marsh should have
testified as he did.   Indeed, whatever were the property
interests which had been held by Marsh and his associates,
they were by the deeds, heretofore referred to in plaintiff's
petition, conveyed to the Omaha Horse Railway Company,
and no act or deed of divestiture has since been shown to
have had existence.

   While it was true that in the suit where this testimony
was taken the Omaha Horse Railway Company's exclusive
franchise was asserted for the purpose of preventing the
use by a rival company of the streets of the city of Omaha
for railway purposes, such issue does not found a substan-
tive basis for plaintiff's present contention.   The tes-
timony of Marsh, under consideration, could only have had
the tendency or effect to impeach the evidence and claims
which he now advances in this case.   Giving that testimony
the full weight to which it is entitled, however, there was

a preponderance in favor of the claims made by Marsh herein. The testimony fails to show the existence of an express trust as against Marsh, or Marsh and his associates in favor of plaintiff, or any other of the stockholders, created by the alleged promises of Marsh to the plaintiff just before the foreclosure sale. If the evidence had been sufficient to sustain the amendments which were proposed to render the petition conformable to the testimony, it would have been prejudicial error to have refused permission to the plaintiff to make the amendments asked in the district court. Whatever amendments are necessary to enable a party to assert his rights or redress grievances should be permitted at any time, even, under our statute, after judgment. But in a case where there is not sufficient proof to sustain the amendment, even if permitted, and in which the general result must have been the same with as without the amendment, there can result no prejudice in refusing to permit the proposed allegation to be made by way of amendment.

In the consideration of the equities urged and insisted upon by the plaintiff, it is impossible to ignore the fact that the alleged grievances had their origin in 1879, and that this suit was not commenced until November, 1889, a period of more than ten years; nor can it be forgotten that while the plaintiff alleges that the time and place of holding directors' meetings was changed so as to be less generally known, yet that plaintiff himself testifies that he attended none of the meetings on account of the small amount of stock which he held. No other stockholder of the company has intervened or in any other way set up or made objection to the contention in this case, and it cannot be assumed that any others exist or have cause of complaint.

2. In the district court appellees pleaded the statute of limitations in bar of this suit. The action was brought for relief on the ground of alleged fraud, and the statute applicable to such cases provides that an action for relief can

Horbach v. Marsh.

only be commenced within four years after the cause of action shall have accrued, but that it shall not be deemed to have accrued until the discovery of the fraud.  The petition in this case was filed November 16, 1889; the sheriff's deed made to Marsh under the decree rendered in the foreclosure suit of Ilers was dated March 15, 1879, and was filed for record March 17, 1879.  As has already been noted, Marsh, from the time of said purchase, treated the property purchased as if he had been its absolute, unqualified owner.  On the 9th day of February, 1884, for instance, Marsh and his wife by deed sold and conveyed to Silas H. H. Clark, Frank Murphy, and Guy C. Barton an undivided three-fifths of said property for the expressed consideration of $150,000.  This deed was filed for record July 11, 1884.  On the 30th day of May 1884, Marsh, Clark, and Barton, their wives and Frank Murphy joining therein, made conveyance of this same property to the Omaha Horse Railway Company for the expressed consideration of $593,000, which deed was filed for record July 11, 1884, the same day on which was recorded the deed last above described.  The proposition of the last above named grantors for the sale of the property conveyed to the Omaha Horse Railway Company was dated February 12, 1884, and was, by resolution of the stockholders of said company, accepted February 20, 1884. The deed pursuant thereto was executed on May 30, following.  There is no charge made that the resolution accepting said proposition was not spread upon the records of the company, and only in very general terms is it alleged that these proceedings were kept concealed.  The petition charged that pending the foreclosure proceedings previous to January 6, 1879, Marsh purchased a majority of the stock of the Omaha Horse Railway Company, and that at the date of said foreclosure he was the holder of a majority of all the stock of said company, but nowhere is it alleged that this acquisition of stock was secretly made,

nor that at the time its purchase was unknown to appellant. Under all these circumstances the bare statement of appellant that the knowledge that defendants repudiated the trust under which this property was held was not acquired until June, 1888, is not determinative of the date from which the statute of limitations began to run. Upon this point the language of Mr. Justice Clifford in *Godden v. Kimmell*, 99 U. S., 201, quoted with approval in *Parker v. Kuhn*, 21 Neb., on page 427, is applicable. He said: "Courts of equity acting on their own inherent doctrine of discouraging, for the peace of society, antiquated demands, refuse to interfere in attempts to establish a stale trust, except where the trust is clearly established, or where the facts have been fraudulently and successfully concealed by the trustee from the knowledge of the *cestui que trust.* Relief in such cases may be sought, but the rule is that the *cestui que trust* should set forth in the bill specifically what were the impediments to an earlier prosecution of the claim; and how he or she came to be so long ignorant of their alleged rights and the means used by the respondent to keep him or her in ignorance, and how he or she first came to a knowledge of their rights," citing *Badger v. Badger*, 2 Wall. [U. S.], 87; *White v. Parnther*, 1 Knapp [Eng.], 227. This language is specially applicable to the averments of the petition upon which the cause was tried; that is, to a trust implied from the official relation of Marsh to the Omaha Horse Railway Company at the time of his purchase of its property. In respect to the additional averments embodied in the amended answer, by which an *express trust* relationship was charged, it is sufficient to repeat that the proofs failed to sustain them, and from this it follows that the operation of the statute of limitations was in no way suspended upon that theory of appellant. This action was, therefore, properly held barred by the statute, more than four years having elapsed from the time when appellant's cause of action, upon any theory

applicable to the evidence, arose.   The judgment of the district court is

AFFIRMED.

RAGAN, C., concurs.

IRVINE, C., concurs in the decision upon the ground that the action is barred by the statute of limitations.